IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARSHA SIMONDS, an individual,  )
and MATTHEW SIMONDS, an        )
individual,                    )   No. 2:21-cv-841
                               )
            Plaintiffs,        )
                               )
       v.                      )
                               )
CHRISTINE BOYER, et al.,       )
                               )
            Defendants.        )

### OPINION

**J. Nicholas Ranjan, United States District Judge**

Historically, parking in Pittsburgh's city neighborhoods has been contentious. For many years, the common dispute centered on whether placing chairs on the side of the street to reserve spots was legal.[1]  (Legal scholars still debate the issue).[2]  This case, though, has taken the ordinary Pittsburgh parking dispute to an entirely new level, serving as the genesis of a 17-count federal civil-rights case against eight defendants.

The case revolves around a parking lot in Squirrel Hill.  The parking lot is owned by Plaintiff Marsha Simonds's company, and it sits in front of the entrance to the Magisterial District Judge (MDJ) office of Allegheny County Magistrate Judge James Hanley.  Many visitors to the MDJ office used the parking lot without permission.  This led to civil litigation, which was ultimately resolved by a consent decree in state court.  The consent decree ordered, among other things, that the MDJ

---

[1] *See, e.g.*, *Pittsburgh Orbit, Can't Sit Down: The Inevitable Parking Chair Post* (May 21, 2023), https://pittsburghorbit.com/2023/05/21/cant-sit-down-the-inevitable-parking-chair-post/ (compiling photographs).

[2] *See, e.g.*, Michael Madison, *Parking Chairs & Property Rights*, Madisonian (Feb. 10, 2010), https://madisonian.net/2010/02/10/parking-chairs-and-property-rights/.

office would obtain two leased spots.  The consent decree, though, didn't end things. About five days after it was entered, this dispute arose.

As discussed in more detail below, on August 27, 2019, a city employee visiting the MDJ office parked in a spot that was not designated for MDJ office visitors, in violation of the consent order.  This incident escalated, and it ultimately led to Ms. Simonds complaining to the MDJ office, and then getting roughly handcuffed, arrested, and charged with disorderly conduct.

After prevailing in her state-court criminal trial for disorderly conduct, Ms. Simonds[3] filed the present lawsuit against Judge Hanley, his secretary (Christine Boyer), the police officers involved in the incident, the City of Pittsburgh, and Allegheny County, for violating her civil rights.  After a round of motion-to-dismiss practice, and a stipulation dismissing certain defendants and claims (ECF 36), six claims from the amended complaint remain, all of which are now the targets of Defendants' summary-judgment motions:

| Count | Claim | Defendants |
|-------|-------|------------|
| 2 | Section 1983/First Amendment Retaliation | Ms. Boyer, Judge Hanley |
| 4 | Civil Conspiracy | Ms. Boyer, Judge Hanley |
| 5 | Section 1983/Fourth Amendment Excessive Force | Officer Thimons |
| 9 | Negligent Infliction of Emotional Distress (NIED) | Ms. Boyer |
| 11 | Section 1983/Fourth Amendment Wrongful Initiation of Proceedings | Ms. Boyer, Judge Hanley, Officer Thimons, Detective Rosato, Sergeant Merkel |
| 12 | Common-Law Malicious Prosecution | Ms. Boyer, Judge Hanley |

---

[3] Ms. Simonds's husband was also an original plaintiff, but the parties dismissed his sole claim (Count 10) in a stipulation.  ECF 36.

Applying the familiar summary-judgment standard and construing the facts in Plaintiffs' best light, the Court will grant in part and deny in part the motions. The Court finds that there are genuine disputes of material fact as to Counts 2, 9, and 12 against Ms. Boyer, and Count 5 against Officer Thimons. Those claims survive; the rest will be dismissed.

## BACKGROUND

On the morning of August 27, 2019, Pittsburgh "Permits, Licenses, and Inspections" Inspector Michael Gillespie pulled in to the parking lot abutting the MDJ office. ECF 83-6, pp. 131:15-132:18. His arrival coincided with Ms. Simonds's, and Ms. Simonds asked him to move his car to one of the parking spots designated for court visitors. ECF 83-3, pp. 52:12-53:3. Rather than move his car, however, Inspector Gillespie entered the MDJ office to speak with Christine Boyer, Judge Hanley's secretary. ECF 83-6, p. 133:2-7. What happened next is, in several important ways, disputed. But first, to fully appreciate what happened that day and beyond, some context is necessary.

I.      **The parking-lot dispute.**

Since around 2016 or 2017, Ms. Simonds's and her family's real-estate holding company owned the parking lot next to the MDJ office. They leased spaces in the lot to local businesses but, from the beginning, had issues with people parking where they weren't supposed to. ECF 83-3, pp. 12:1-12, 16:20-24, 19:14-21, 21:21-22:1, 23:16-24:3. The violations—occurring multiple times each week—commonly came from visitors to the MDJ office, which did not then lease any of the lot's spaces. *Id.* pp. 23:16-22, 24:8-15, 24:20-23, 27:18-25.

Ms. Simonds worked in a building across the street and took an active role in enforcing the company's leases. To that end, when she noticed visitors to the MDJ office using the lot, she would tell people that they couldn't park there. *Id.* pp. 26:8-27:2, 33:12-34:1. Ms. Simonds's mother and husband did so, as well. *Id.* pp. 33:23-

34:8.  And when visitors would ignore Ms. Simonds—a frequent occurrence—she would write emails to Allegheny County.  Still, she found no reprieve.  *Id.* pp. 29:9-20, 34:18-23.  Occasionally, she would also call the police or a towing company to deal with the issue.  *Id.* pp. 51:4-7, 61:18-62:2.[4]  But before the August 27, 2019, incident, Ms. Simonds said she had never entered the MDJ office to discuss parking.  *Id.* pp. 36:5-10, 37:23-38:8.

Eventually, the parking issues between Ms. Simonds's family and the County transformed into litigation in state court, with the County intervening in an ongoing case between Ms. Simonds's holding company and the owner of the building that housed the MDJ office.  *Id.* pp. 32:19-33:2, 42:8-45:2; ECF 82-2, pp. 52:14-53:14, 54:1-8.  That litigation culminated on August 22, 2019, with a consent order signed by the parties' attorneys and a Court of Common Pleas judge.  ECF 82-5.  Pursuant to that order, the County agreed on a trial basis to lease two parking spaces from Ms. Simonds's family's company.  *Id.* p. 2.  Ms. Simonds then sent that order to Pittsburgh Police Commander Daniel Herrmann, whose jurisdiction included the MDJ office, and with whom she had been communicating about the parking violations.  ECF 83-3, pp. 47:2-7, 50:2-14; ECF 82-10, pp. 22:7-15, 35:23-37:23.

Based on the above, the parking-lot dispute seems benign.  But, reflecting a common theme in this case, Judge Hanley's and Ms. Boyer's recollection of events preceding the August 27, 2019, incident tells another story.

In their version, Ms. Simonds and her family were, for years, a thorn in the MDJ office's side.  Ms. Boyer called the police about their disruptions several times before August 2019, and recounted several instances of hostility.  ECF 82-1, pp. 102:7-103:3.  These included Ms. Simonds screaming at Ms. Boyer across the parking lot and calling her a "bitch[,]" *id.* pp. 105:4-106:6; Ms. Simonds's mother coming in to the

---

[4] The towing stopped when an operator put a police vehicle on its bed, and the officer threatened the operator with his gun.  *Id.* pp. 37:4-22, 61:20-62:2.

MDJ office, yelling about the parking lot; and Ms. Simonds yelling at Ms. Boyer about the parking lot on the phone and, in one instance, in the MDJ office. *Id.* pp. 28:7-29:16, 30:5-32:22. Ms. Boyer and Judge Hanley talked about the parking saga, and agreed that they would not police the lot. *Id.* pp. 114:9-22, 117:15-19. Suffice it to say that, well before August 27, 2019, Ms. Boyer did not like Ms. Simonds, and Judge Hanley was aware of that fact. *Id.* pp. 50:22-51:5, 77:7-21; ECF 82-2, pp. 59:5-61:15; ECF 94-14.

## II.    The August 27, 2019, arrest.

Back to the morning of August 27, 2019. What follows is the events of that day in the light most favorable to Ms. Simonds.

Ms. Simonds was not confrontational with Inspector Gillespie in the parking lot. ECF 83-6, p. 143:16-24. After their discussion, she followed Inspector Gillespie into the MDJ office waiting room and again asked him to move his car. ECF 83-3, pp. 55:2-21. Ms. Boyer was not at her desk. Seeking to nip the issue in the bud without involving the police, Ms. Simonds left and headed to her own office across the street to print out the recent court order. *Id.* pp. 55:8-57:13. By the time Ms. Simonds returned, Ms. Boyer was back at her desk. *Id.* pp. 57:11-21. Ms. Simonds then handed the order to Ms. Boyer and reiterated her request that Inspector Gillespie move his car. *Id.* That was not well taken by Ms. Boyer; she dismissively waved Ms. Simonds off and, in a raised voice, told her to leave. *Id.* pp. 58:9-59:1. Ms. Simonds responded that she would call the police and have Inspector Gillespie's car towed. *Id.* pp. 57:11-21. She then dialed 911 and walked out of the MDJ office to wait for the police in the parking lot. *Id.* pp. 59:21-25, 62:12-20. While she waited, Judge Hanley arrived to the MDJ office and walked past her. *Id.* p. 153:12-17.

Pittsburgh police officers—including Defendant Officer Adam Thimons and Detective Michael Burns—soon arrived. They walked past Ms. Simonds and her co-worker—ignoring Ms. Simonds's attempts to get their attention—and entered the

MDJ office. *Id.* pp. 67:21-71:25; ECF 82-8, p. 77:9-12. A few minutes later, Officer Thimons emerged, and with Detective Burns, made a beeline across the parking lot in Ms. Simonds's direction. ECF 83-3, pp. 72:9-74:5; ECF 82-8, pp. 63:14-25, 116:6-9; 157:16-158:1.

While closing the distance, Officer Thimons commanded Ms. Simonds to turn around, and told her that she was being arrested. Ms. Simonds responded—at a volume like Officer Thimons's, elevated to carry over the parking lot—that she had called 911, that she was the property owner, and to call Commander Herrmann. ECF 83-3, pp. 81:10-82:18. Although she was confused by Officer Thimons's commands, she complied; Ms. Simonds turned around and placed her hands behind her back. *Id.* pp. 76:3-77:9. Despite her compliance, however, Officer Thimons and Detective Burns grabbed her arm, causing everyone to "sp[i]n a little bit[,]" and grabbed and pushed or pulled or twisted her arms together—hard enough to cause Ms. Simonds pain in her upper back, which she complained about to the officers. ECF 82-8, pp. 117:25-118:8, 118:11-19; ECF 83-3, pp. 77:4-14, 79:20-80:14. The officers then pushed or threw[5] Ms. Simonds against the hood and grill of her car—an arm's length away— with "good force[,]" enough to move her feet, and handcuffed her before placing her in the back of a police vehicle. ECF 83-3, pp. 78:14-79:19; 76:6-77:17.

In all, Ms. Simonds was handcuffed for around at least 20 minutes, and in the police vehicle for around 30 minutes. ECF 84-6. She complained of upper back and shoulder pain while cuffed in the police car, and though an ambulance was called, she did not speak with the paramedics because she was instructed by officers to leave the premises. *Id.* 19:50-19:56; ECF 83-3, pp. 89:21-90:7, 108:4-109:24; ECF 83-4, p. 12.

---

[5] Ms. Simonds described being "throw[n]" against the car when she was interviewed contemporaneously by Sergeant Merkel. ECF 84-5, 1:04-1:16. At her deposition, Ms. Simonds described it as being pushed—mirroring defense counsel's phrasing of the question.

At some point after the incident, she did, however, seek treatment with her chiropractor and physical therapist. ECF 83-3, pp. 112:25-113:5, 114:11-15.

For what it's worth at this stage, Defendants' version of that day differs considerably. Ms. Boyer recounted Inspector Gillespie entering the MDJ office, complaining about Ms. Simonds screaming at him in the parking lot. ECF 83-6, pp. 75:5-76:19. Familiar with Ms. Simonds and the parking dispute, and wishing to avoid confrontation, Ms. Boyer retreated from her desk to an adjacent room. *Id.* pp. 68:12-69:11. Ms. Simonds then entered the waiting room, yelling and screaming at Inspector Gillespie loud enough for Ms. Boyer to hear. *Id.*, pp. 69:2-15. Ms. Simonds eventually left, and Ms. Boyer went back to her desk. ECF 82-1, pp. 119:24-120:5. But Ms. Simonds returned, and Ms. Boyer became Ms. Simonds's new target. *Id.* pp. 120:4-124:16. When Ms. Simonds refused to leave, Ms. Boyer called 911. Though she could no longer see Ms. Simonds, Ms. Boyer told 911 that Ms. Simonds was in the office yelling at her, generally being disruptive, and refusing to leave. *Id.* pp. 120:11-121:5, 124:6-128:2.

The police arrived, walking past Ms. Simonds in the parking lot, who was screaming and pacing. ECF 83-6, pp. 153:2-156:16, 159:10-13.[6] Officer Thimons and Detective Burns spoke with Ms. Boyer, and then headed toward Ms. Simonds. *Id.* p. 153:2-24. Officer Thimons instructed her to turn around and put her hands behind her back. ECF 82-8, p. 66:1-6. Those commands set Ms. Simonds off, who became "pretty upset" and "a little bit aggressive[,]" yelling about calling Commander Herrmann and that Commander Herrmann said the officers couldn't touch her. ECF 83-6, pp. 153:20-154:13, 160:18-161:3; ECF 82-8, pp. 66:5-67:11. The officers grabbed

---

[6] Officer Thimons's recounting of Ms. Simonds's behavior in the parking lot when he arrived differed from Detective Burns's. Officer Thimons said Ms. Simonds was standing in the parking lot with her arms crossed, looking upset and angry. ECF 82-8, p. 64:5-9.

her arm—while she was facing them, as she hadn't turned around or put her arms behind her back—causing everyone to "sp[i]n a little bit[,]" and applied "a little bit of force" to push her arms together and secure them with handcuffs, as she had tensed up. ECF 82-8, pp. 65:3-14, 118:1-19. The entire ordeal lasted a few seconds, and Ms. Simonds did not show any signs of pain or discomfort. *Id.* p. 65:15-20; ECF 83-4, p. 9. The officers then walked Ms. Simonds to the back of the police vehicle, without ever placing or throwing her against any car. ECF 82-8, pp. 118:20-24, 169:1-5; ECF 83-4, p. 9.

## III.      The backroom meeting.

While Ms. Simonds sat in the back of the police vehicle, several officers met with Judge Hanley and Ms. Boyer in a file room near Judge Hanley's chambers. Part of that meeting was captured by Sergeant Elizabeth Merkel's bodycam. ECF 84-4.

In that video, Sergeant Merkel arrives to the office and enters the room while the meeting is underway. *Id.* at 9:00. Within, Judge Hanley, Ms. Boyer, Detectives Donald Pasquarelli and Francesco Rosato, and Officer Thimons are standing in a circle, discussing the events. *Id.* Ms. Boyer expresses that "they're going to keep coming in here every time someone parks" before she is interrupted by Sergeant Merkel's entrance. *Id.* 9:00-9:12. Ms. Boyer then leaves, and the conversation turns to Commander Herrmann's involvement and how Ms. Simonds should be charged. *Id.* 9:20-10:00. Detective Pasquarelli explains that he is looking at it from Officer Thimons's benefit, and voices his preference for a citation, rather than a physical arrest, because he doesn't want anything to "bite [Officer Thimons] in the ass." *Id.* 9:30-40; ECF 83-7, p. 181:4-20. In response, Judge Hanley offers a comment that he "think[s] you should do a citation." ECF 84-4, 9:25-9:41. Sergeant Merkel notes that a police lieutenant too recommended a citation, and asks whether Judge Hanley is comfortable with a citation. Judge Hanley responds that he is. *Id.* 9:41-9:49. The conversation continues, and Judge Hanley states that Ms. Simonds "has the

Commander's cellphone for Chrissake[,]" and throws up his hands while saying "this was ass-backwards[.]"  *Id.* 9:57-10:02.  The topic shifts to Commander Herrmann's involvement, and Sergeant Merkel turns her bodycam off.  *Id.* 10:03-10:17.  The group then continued their discussion about Commander Herrmann and what to do with Ms. Simonds.  ECF 82-11, pp. 165:22-167:8.  When they finished, Sergeant Merkel left to speak with Ms. Simonds.  *Id.* pp. 177:3-178-20; ECF 84-5.

IV.      **After the arrest.**

Back outside, with her bodycam again recording, Sergeant Merkel took Ms. Simonds's handcuffs off and spoke with her about the events.  Eventually, other officers joined, and after around 20 minutes, Sergeant Merkel instructed Ms. Simonds to leave the scene.  ECF 84-5.

The police did not charge Ms. Simonds that day.  Instead, the events of August 27, 2019 prompted two disorderly-conduct citations/summons, prepared by Officer Thimons, which the police later mailed to Ms. Simonds.  ECF 83-4, pp. 1-2.

One citation was for making unreasonable noise, in violation of 18 Pa. C.S. § 5503(a)(2).  Officer Thimons described the nature of the offense as responding to a call "for a disorderly female refusing to leave[,]" and that Ms. Simonds entered the office and "yell[ed] obscenities . . . in the presence of numerous alarmed individuals."  ECF 83-4, p. 1.  The other was for creating a hazardous or physically offensive condition by an act with no legitimate purpose, in violation of 18 Pa. C.S. § 5503(a)(4).  In that one, Officer Thimons reported that Ms. Simonds "acted disorderly by yelling obscenities at . . . Inspector Gillespie to the point that he felt threatened by her erratic behavior."  *Id.* p. 2.

The criminal case against Ms. Simonds proceeded to trial before a magistrate judge (not Judge Hanley).  At Ms. Simonds's November 2020, summary trial, the magistrate judge dismissed the violation of Section 5503(a)(4) (the charge involving Ms. Simonds yelling obscenities at Inspector Gillespie), but found Ms. Simonds guilty

of violating Section 5503(a)(2) (the charge involving Ms. Simonds yelling obscenities inside of the MDJ office).  ECF 84-2; ECF 84-1.  Ms. Simonds then appealed that conviction to the Court of Common Pleas.

On June 6, 2021, the eve before the appeal hearing, the Assistant District Attorney (ADA) prosecuting the case emailed Judge Hanley and the Deputy Court Administrator for the Allegheny County Courts to explain that they "should seriously consider withdrawing the [disorderly conduct] charges[.]"  ECF 94-14, p. 4.  He noted that he would "do whatever you want[,]" but was "prepared to go" to the hearing.  *Id.* After the Administrator replied that "[y]ou have to do what you think is appropriate[,]" the ADA said that he was "planning to conduct the hearing[,]" he "just want[ed] to let folks know of the hiccups in the matter[.]"  *Id.* p. 3.

Judge Hanley did not reply until later that evening.  He stated that although the ADA was "at a disadvantage" and facing "an uphill battle[,]" he would "like to proceed."  *Id.*  He added his "fear that . . . withdrawal [of the remaining charge would] only embolden Ms. Simonds all the more."  *Id.*  Sure enough, the appeal proceeded. At the close of the government's case and after a defense motion for a judgment of acquittal, the judge dismissed the remaining charge.  ECF 83-6; ECF 83-8.  Ms. Simonds filed this civil-rights case later that month.

The Court need not relate in detail the testimony at the trial and appeal, save for one thing.  Central to Ms. Simonds's claims is Inspector Gillespie's testimony; specifically, the discrepancy between what Ms. Boyer told 911 and police (as reflected in the police reports and citations, and as Ms. Boyer testified to at the trial and appeal), and Inspector Gillespie's in-court testimony about Ms. Simonds's behavior. Unlike what Ms. Boyer reported, Inspector Gillespie testified that his conversation with Ms. Simonds in the parking lot was calm and business-like.  ECF 84-2, p. 12:1-3; ECF 83-6, pp. 133:2-7, 137:5-11.  He did explain that when Ms. Simonds entered the waiting room after Ms. Boyer reappeared, Ms. Simonds and Ms. Boyer got into a

"loud" argument about Inspector Gillespie's vehicle.  ECF 84-2, pp. 13:6-14:9; ECF
83-6, pp. 133:18-134:18.  But Inspector Gillespie clarified that he wasn't afraid of Ms.
Simonds, and said that Ms. Simonds never used profanity, threatened, harassed, or
even engaged with him or anyone else in the waiting room.  ECF 84-2, pp. 14:11-13,
24:7-23, 25:4-6, 31:14-24; ECF 83-6, pp. 139:21-140:20.

## <u>DISCUSSION & ANALYSIS</u>

**I.      Count 2: First Amendment Retaliation.**[7]

To state a First Amendment retaliation claim, Ms. Simonds "must show (1)
that [she] engaged in a protected activity, (2) that defendants' retaliatory action was
sufficient to deter a person of ordinary firmness from exercising his or her rights, and
(3) that there was a causal connection between the protected activity and the
retaliatory action."  *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267
(3d Cir. 2007).  When the claim alleges retaliation in the form of criminal prosecution,
as it does here, the third element, "causation[,] requires a special method of proof—
the plaintiff must plead and prove the absence of probable cause."  *Brantley v.
Wysocki*, 662 F. App'x 138, 142 (3d Cir. 2016) (citing *Hartman v. Moore*, 547 U.S. 250,
265-66 (2006)).[8]  Such a claim also requires another element: proof that the defendant

---

[7] Ms. Simonds didn't raise a false arrest or false-imprisonment claim, so the Court
reasonably construes her First Amendment retaliation claim to relate solely to the
wrongful initiation of proceedings (*i.e.*, malicious prosecution) Section 1983 claim.

[8] The *Hartman* probable-cause "requirement applies whether the defendant induced
another person to file charges . . . or initiated the prosecution himself[.]"  *Brantley v.
Wysocki*, 662 F. App'x 138, 142 (3d Cir. 2016).  The Court finds that Ms. Simonds's
First Amendment retaliation claim implicates *Hartman* because as framed by Ms.
Simonds, Ms. Boyer's call to police and false statements, and Judge Hanley's
backroom meeting and discussion with the ADA, resulted in Ms. Simonds's
prosecution.  *See Halsey v. Pfeiffer*, 750 F.3d 273, 279 (3d Cir. 2014) (officers liable for
malicious-prosecution claim where they fabricated oral confession that led to
prosecutor filing criminal charges).  Moreover, Ms. Boyer identifies this additional
element, yet Ms. Simonds doesn't mention it at all.  That also supports the Court's
finding.  *See, e.g.*, *Farmer v. Decker*, 353 F. Supp. 3d 342, 352 (M.D. Pa. 2018)

"induced the prosecutor to bring charges that would not have been initiated without [the defendant's] urging." *Hartman*, 547 U.S. at 262; *Pellegrino v. U.S. Transp. Sec. Admin.*, No. 09-5505, 2014 WL 3952936, at *4 (E.D. Pa. Aug. 12, 2014) (same).

The Court concludes that Ms. Simonds has presented sufficient evidence against Ms. Boyer to meet these elements, but not against Judge Hanley.

### A.    Ms. Simonds's First Amendment retaliation claim against Ms. Boyer survives.

Addressing the four elements of the retaliation claim, the Court finds that, viewing the evidence in her favor, Ms. Simonds has presented sufficient evidence on each to present her claim to a jury.

First, protected activity. There is evidence that Ms. Simonds engaged in protected activity under the First Amendment (*i.e.*, by pursuing the consent order over the parking issues, and making comments on August 27, 2019, to enforce the consent order). *See Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 284 (3d Cir. 2004) (finding plaintiff's complaints and even private grievances against government officials protected activity for First Amendment retaliation claim). Ms. Boyer argues that she (and Judge Hanley) weren't the actual parties involved in the state-court parking-lot litigation, and that that was a case between Ms. Simonds's company and the County. ECF 86, p. 8. That argument is too technical. As is clear from the litigation and resulting consent order, the MDJ office had an interest in the matter, and, as is clear from Ms. Boyer's deposition testimony, there had been a lot of bad blood between Ms. Boyer and Ms. Simonds over these litigated parking issues.

Second, retaliation. There is evidence that Ms. Boyer retaliated against Ms. Simonds when Ms. Boyer called 911 and reported to 911 and the responding police

(examining *Hartman* probable-cause requirement where defendant characterized First Amendment claim as requiring lack of probable cause and plaintiff didn't challenge that characterization).

officers that Ms. Simonds was refusing to leave the MDJ office and screaming, harassing, and threatening her, Inspector Gillespie, and other court visitors. Given Inspector Gillespie's trial and appeal testimony, there is clearly a question of fact as to whether Ms. Boyer's version of events is true. And if Ms. Boyer's version isn't true, then, whether Ms. Boyer was knowingly lying or was just mistaken is a fact issue that the Court can't resolve.

As for the nature of the retaliation, there is no dispute that the events that followed were sufficient to deter someone of ordinary firmness from exercising their rights. *Miller v. Mitchell*, 598 F.3d 139, 152 (3d Cir. 2010) ("There is no doubt a prosecution meets [the retaliation] test[.]").[9]

Third, causation (including probable cause for the charges). There is evidence of a causal link between the protected activity and the August 27, 2019, retaliation (*i.e.*, temporal proximity between the consent order and the incident that occurred five days later, and Ms. Simonds's attempt to enforce that consent order the day of the incident, as well as a pattern of antagonism regarding parking). *See Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 759 (3d Cir. 2019) (describing causation).

There is also a factual dispute about whether there was probable cause to charge Ms. Simonds. For probable cause to exist, there need only be "a 'fair probability' that the person committed the crime at issue[,]" *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000), a "significantly lower" evidentiary standard than that

---

[9] Ms. Simonds's other theory of retaliation is that her mother's company made a demand in May 2018 against Judge Hanley for payment of a $15,000 debt associated with Judge Hanley's father's estate. This is not protected activity; Ms. Simonds admitted that she had no involvement with the debt. ECF 83-3, pp. 187:1-14, 188:13-189:3, 189:13-15, 190:2-10. Plus, it is so disconnected from the parking-lot dispute in both time and nature that there is insufficient evidence of causation. *See Conard v. Pennsylvania State Police*, 902 F.3d 178, 184 (3d Cir. 2018) (noting although there is no "bright line rule[,]" at the summary judgment stage, temporal proximity is often measured in days). At trial, Ms. Simonds may not proceed on this theory.

required for conviction. *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005). At the summary-judgment stage, "[a] court makes a probable cause determination on the totality of the circumstances[.]" *Halsey v. Pfeiffer*, 750 F.3d 273, 301 (3d Cir. 2014) (cleaned up). This is an "entirely objective" analysis, in which the Court "measure[s] the cumulative weight of all of the evidence and account[s] for reasonable inferences that can be drawn from it." *Id.* at 299, 302. Because "[t]his totality-of-the-circumstances inquiry is necessarily fact-intensive[,] . . . it will usually be appropriate for a jury to determine whether probable cause existed." *Harvard v. Cesnalis*, 973 F.3d 190, 200 (3d Cir. 2020) (cleaned up).

Ms. Simonds has set forth evidence that the charges against her were baseless, and that Ms. Boyer essentially lied about Ms. Simonds being disruptive. In a malicious-prosecution claim against the complainant (as opposed to the officer who filed the charges), materially false information is excluded from the probable-cause analysis. *See Halsey*, 750 F.3d at 279, 301 & n.26 (explaining, in context of probable cause for Fourth Amendment malicious-prosecution claim against officers who allegedly fabricated a confession, that without a false confession, "there would not have been direct evidence linking [the plaintiff] to the crimes so that the prosecutor would not have had cause to prosecute [him]"); *see also Kessler v. Borough of Frackville*, No. 17-2231, 2018 WL 2113648, at *4 (M.D. Pa. May 8, 2018) (same but for prosecution premised on materially false statements in affidavit and criminal complaint).

Ms. Boyer's main argument in response is unconvincing. She asserts that probable cause existed because she, Officer Thimons, and other defendants believed probable cause existed for a separate uncharged offense of defiant trespass. ECF 86, pp. 12. But this misapprehends the probable-cause analysis, as it focuses on subjective beliefs, and not objective facts. What's more, Officer Thimons didn't charge Ms. Simonds with defiant trespass; he charged her with disorderly conduct. ECF 83-

4. And in any event, "the presence of probable cause for one charge does not automatically defeat a Fourth Amendment malicious-prosecution claim alleging the absence of probable cause for another charge." *Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295, 297 (3d Cir. 2024) (quoting *Chiaverini v. City of Napoleon,* 602 U.S. 556, 561 (2024)); *see also Alburg v. Jones*, No. 21-2580, 2023 WL 2823895, at *3 (3d Cir. Apr. 7, 2023) (error to dismiss malicious-prosecution claim based on probable cause for only one of several charges). So even if probable cause existed for trespass, that would not close the door on Ms. Simonds's First Amendment malicious-prosecution claim based on her prosecution for disorderly conduct.

Fourth, inducement. As explained above, there are fact questions as to whether, without Ms. Boyer's report of events, Officer Thimons would have cited Ms. Simonds.

There are sufficient facts presented to meet all four elements of the retaliation claim against Ms. Boyer. The Court will thus deny summary judgment on this claim.

### B. Ms. Simonds's First Amendment retaliation claim against Judge Hanley will be dismissed.

Though Ms. Simonds's claim against Ms. Boyer survives, her claim against Judge Hanley does not. Ms. Simonds does not have sufficient evidence that Judge Hanley initiated or continued the prosecution.

Ms. Simonds's retaliation theory against Judge Hanley essentially centers on Judge Hanley's initiation of the charges against her, as well as his role in later communicating with the prosecutor to urge the continued prosecution of the charges. The problem with this claim is there are insufficient facts proffered to support the idea that Judge Hanley engaged in such retaliation.

Beginning with Ms. Simonds's theory of "initiation of the charges," Judge Hanley did not arrive to the MDJ office until after Ms. Simonds had left and the police were called, he did not see her act disorderly, and he had no idea whether she was, in

fact, disorderly.  ECF 82-2, pp. 161:9-18, 163:19-164:2.  The only information he did have was what Ms. Boyer (and to a minor extent, Mr. Gillespie), told him.  ECF 82-1, p. 89:2-7; ECF 82-2, pp. 160:22-161:8, 169:3-12, 233:9-19.[10]  So Judge Hanley's involvement before the backroom meeting is limited.

As for the backroom meeting, Sergeant Merkel's bodycam video supports Judge Hanley's position that he wasn't the "driving force" behind the summons; that the officers had "already made a determination that they were going to do something" to Ms. Simonds when Judge Hanley offered his opinion that a citation, and not a physical arrest, was appropriate.  ECF 82-2, pp. 157:6-12, 162:12-20.

In the video, Judge Hanley's suggestion that Ms. Simonds be cited is a response to Detective Pasquarelli's statement that the Detective wasn't sure if they should proceed with a citation or physical arrest of Ms. Simonds—not whether they should charge Ms. Simonds at all.  ECF 84-4, 9:25-41.  And Judge Hanley's response to Sergeant Merkel's question of whether he was comfortable with a citation followed from a lieutenant's suggestion that the officers should cite Ms. Simonds.  *Id.* 9:41-50.

True, Sergeant Merkel enters the backroom while the occupants are mid-conversation, and Sergeant Merkel turns off her bodycam a few minutes after she arrives.  So Judge Hanley could have compelled the officers to proceed when the conversation wasn't taped.  But there is no evidence that occurred.  A "metaphysical doubt"—"speculation, conjecture, and the inferences drawn therefrom"— isn't enough to survive summary judgment. *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 194 (3d Cir. 2014) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

---

[10] According to Judge Hanley, Mr. Gillespie said "who's that crazy lady and what's she doing here[,]" and told him that Ms. Simonds was loud.  ECF 82-2, pp. 151:1-7, 164:3-15.

The Court next turns to Ms. Simonds's "continuation" theory.[11]  That too fails because the ADA stated his intention to proceed with the hearing **before** Judge Hanley chimed in.  ECF 94-14, p. 3.  To be sure, the ADA expressed his reservations about the strength of the case, recommended that they "should seriously consider withdrawing" it, and advised that he would "do whatever [they] want[ed.]"  ECF 94-14.  But the ADA's willingness to withdraw the remaining charge if Judge Hanley desired is not the same as Judge Hanley "dissuad[ing] a wavering prosecutor from dropping the charges[.]"  *Thomas v. City of Phila.*, 290 F. Supp. 3d 371, 383 (E.D. Pa. 2018) (denying motion to dismiss Fourth Amendment malicious-prosecution claim where complaint supported inference that photographs of car other than plaintiff's "were used to shore up a weakening case and dissuade a wavering prosecutor from dropping the charges").  The email is unequivocal—absent an objection from Judge Hanley or the Administrator, the ADA was going to the summary appeal.

In sum, there are insufficient facts to suggest that Judge Hanley had any role in engaging in retaliatory conduct that could have caused or induced the charges or continued prosecution here. The Court will thus grant summary judgment as to Ms. Simonds's First Amendment retaliation claim against Judge Hanley.

---

[11] Judge Hanley does not challenge the existence of a First Amendment retaliatory claim premised on a prosecution's continuation.  It appears that the Third Circuit has not yet endorsed such a claim (whether in the First Amendment retaliation or Fourth Amendment malicious-prosecution context).  *See Geness v. Cox*, 902 F.3d 344, 359 n.12 (3d Cir. 2018) (citing cases), *but see Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 793 (3d Cir. 2000) (considering school district superintendent's affirmation to the prosecuting detective before the preliminary hearing that she still wanted to prosecute plaintiff as part of retaliatory conduct).  But it seems likely that such a claim is viable.  *See, e.g.*, *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012) (describing Section 1983 malicious-prosecution claims as "concerning the initiation **or maintenance** of a prosecution" (emphasis added)).

II.        **Count 4: Pennsylvania Civil Conspiracy.**

Ms. Simonds premises her conspiracy claim on Judge Hanley's and Ms. Boyer's lawful agreement (to not police the parking lot) by unlawful means (to induce or continue a knowingly wrongful criminal prosecution against her).  ECF 91, p. 15. This claim fails due to lack of sufficient evidence.

A Pennsylvania civil conspiracy requires "1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; 2) an overt act done in pursuance of the common purpose; and 3) actual legal damage." *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. Ct. 2004).

Even assuming that there was an overt act performed by Ms. Boyer,[12] and legal damage to Ms. Simonds, there is insufficient evidence of an agreement.  Specifically, there is insufficient evidence suggesting that Ms. Boyer and Judge Hanley agreed to induce or continue an unlawful criminal prosecution.

The evidence that Ms. Simonds points to is simply too speculative to get to a jury.  She asks the Court to make an inferential leap of an unlawful conspiratorial agreement, because: (1) Ms. Boyer and Judge Hanley attended to the backroom meeting; (2) police officers wrote citations and reports, leading to Ms. Simonds's prosecution; and (3) Ms. Simonds overheard Detective Burns later say, "this is what happens when you mess with the Court" while she was in the back of the police

---

[12] As discussed above, there is a fact question as to whether Ms. Boyer committed an overt tortious act—*e.g.*, lying to the police to generate the original charges.  Also, as discussed above, there is no evidence of such an overt act by Judge Hanley.  But that doesn't end things, because "[o]nce there is an agreement, a conspirator may be liable for overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act."  *Church Mut. Ins. v. All. Adjustment Grp.*, 102 F. Supp. 3d 719, 732 (E.D. Pa. 2015) (cleaned up), *aff'd*, 708 F. App'x 64 (3d Cir. 2017). In other words, "so long as a plaintiff has alleged a tort against one member of the conspiracy, a plaintiff need not allege an underlying tortious claim against every co-conspirator."  *Id.* at 732 n.12 (cleaned up).

vehicle. ECF 92, pp. 25-26. While circumstantial evidence can support a conspiracy, this evidence here is simply too speculative as to Judge Hanley forming a specific *unlawful* agreement with Ms. Boyer. The critical evidence that is missing—whether direct or circumstantial—are the dots connecting Ms. Boyer and Judge Hanley and some sort of joint decision to pursue a baseless and unlawful prosecution.[13] Without this evidence, Ms. Simonds is left only with speculation. And speculation isn't enough to survive summary judgment. *Greene*, 557 F. App'x at 194.

Without an agreement, Ms. Simonds's conspiracy claim against Judge Hanley and Ms. Boyer withers. The conspiracy claim will therefore be dismissed.

## III.    Count 5: Fourth Amendment Excessive Force.

Officer Thimons argues that Ms. Simonds's excessive-force claim against him fails as a matter of law, and is also barred by qualified immunity. Because of disputed material facts, the Court disagrees. This claim may proceed.

### A.    There is a dispute of material fact as to whether Officer Thimons's use of force was unconstitutional.

The Court first examines the sufficiency of the claim. "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (citation omitted). Whether there was a "seizure" isn't in dispute. So the question is instead whether the seizure was "unreasonable." *Id.*

"[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, is constitutionally unreasonable." *Whiting v. Bonazza*, 545 F. App'x 126, 130 (3d Cir. 2013) (cleaned up). "[T]he standard is whether the police officer's actions were objectively reasonable in light of the facts and circumstances,

---

[13] Indeed, the facts here demonstrate that Ms. Boyer left the backroom meeting before the discussion occurred over how the officers might cite her. ECF 84-4.

regardless of the officer's intent or motivation." *El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020) (cleaned up); *Graham v. Connor*, 490 U.S. 386, 397 (1989).

In making this determination, courts are to consider the *Graham* and *Sharrar* factors[14]: (1) the severity of the crime at issue; (2) whether the plaintiff poses an immediate threat to the officer or public safety; (3) whether the plaintiff is actively resisting or attempting to evade arrest; (4) physical injury to the plaintiff; (5) whether the plaintiff is violent or dangerous; (6) the duration of the use of force; (7) whether the use of force takes place in the context of effecting an arrest; (8) the possibility that the plaintiff may be armed; and (9) the number of people with whom the officers must contend at one time. *See El*, 975 F.3d at 336.

Applying those factors to the facts here, a reasonable jury could conclude that Officer Thimons's alleged actions—grabbing Ms. Simonds, twisting her arms, and pushing or throwing her into a car—were objectively unreasonable under the circumstances (viewed in the light most favorable to Ms. Simonds).

Ms. Simonds is 5'5" tall, and weighed around 150 pounds, ECF 83-3, p. 85:7-8; ECF 83-4, p. 5, while Officer Thimons weighed around 250 pounds, and Detective Burns more than that. ECF 82-8, p. 132:4-7. Officer Thimons was responding to a non-severe crime, either defiant trespass or disorderly conduct. *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (disorderly conduct not severe); *Kapepula v. City of Lancaster*, No. 22-4741, 2024 WL 4898078, at *3 (E.D. Pa. Nov. 26, 2024) (trespass not severe). Ms. Simonds was standing in the parking lot when Officer Thimons and Detective Burns approached, and rather than cause a scene or attempt to flee, she turned around and placed her hands behind her back. ECF 83-3, pp. 72:4-74:5, 76:3-77:9; ECF 82-8, p. 77:9-12. There was no evidence that she was armed or dangerous or that the officers were told so before they approached her. And

---

[14] *Graham v. Connor*, 490 U.S. 386 (1989); *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1997).

there was only one other woman standing with Ms. Simonds, and Officer Thimons was himself accompanied by Detective Burns. ECF 83-3, pp. 72:7-73:3, 75:6-7; ECF 82-8, pp. 65:2-11.

All of these facts "tend to show that Officer [Thimons's] force was excessive[.]" *See El*, 975 F.3d at 341 (explaining "no serious crime, no immediate safety threat, . . . no resistance or flight by the [plaintiffs who were] . . . not armed and . . . significantly outnumbered" "tend[ed] to show . . . excessive[ness]").[15]  In fact, Officer Thimons agreed that it would be unreasonable to use force if the arrestee complied with orders and did not make any threats or aggressive movements, ECF 82-8, pp. 166:23-167:5, 171:10-19, and Commander Herrmann testified that it would be unreasonable to push a compliant person being handcuffed against a car.  ECF 82-10, p. 50:17-20.  *See Green v. New Jersey State Police*, 246 F. App'x 158, 162 n.7 (3d Cir. 2007) (in reasonableness determination, highlighting that defendant officer agreed that, if the plaintiff's characterization was true, the force would have been excessive); *cf. Johnson v. City of Phila.*, 837 F.3d 343, 351 & n.47 (3d Cir. 2016) ("We do not automatically discount . . . that official police department policies may be considered among other things in the reasonableness inquiry[.]").

True, Ms. Simonds didn't appear to suffer significant injuries.  But "the absence of injury does not legitimize otherwise excessive force." *Graham-Smith v. Wilkes-Barre Police Dep't*, 739 F. App'x 727, 731 (3d Cir. 2018) (citing cases).  And the test is reasonableness ***under the circumstances***, not whether the amount of force used satisfies an arbitrary excessiveness threshold.  Even handcuffing alone—which is less force than that alleged by Ms. Simonds here—might be unreasonable, if

---

[15] The use of force in *El*, grabbing an arrestee by the wrist and neck, and slamming him into a wall and pavement, is clearly more excessive than what Ms. Simonds alleges occurred to her.  Still, the Court finds its consideration of the various factors instructive.

accompanied by "some indication that it was done unnecessarily **or** excessively." *Id.* at 732 (emphasis added).

So considering the facts in the aggregate, this case isn't an exception to the rule that reasonableness is a fact question for the jury to resolve. *Jefferson v. Lias*, 21 F.4th 74, 79 (3d Cir. 2021). This is particularly the case where the reasonableness hinges on disputed facts, such as whether Ms. Simonds resisted, whether she told Officer Thimons she was in pain, and whether Officer Thimons pushed or threw her into a car. *See Singler v. Caterino*, No. 19-172, 2023 WL 4089104, at *5 (W.D. Pa. June 20, 2023) (Gibson, J.) (denying summary judgment on Fourth Amendment excessive-force claim where "key questions of fact . . . ma[d]e a reasonableness determination . . . inappropriate"); *see also Fought v. City of Wilkes-Barre,* No. 17-01825, 2024 WL 4341343, at *4 (M.D. Pa. Sept. 27, 2024) (same).

For all these reasons, the Court finds that Ms. Simonds has proffered sufficient evidence of a constitutional violation, and while disputed in many ways, those disputes are for the jury to resolve.

### B. There is a dispute of material fact as to whether Officer Thimons is protected by qualified immunity.

The analysis is not finished, however, because Officer Thimons raises a qualified-immunity defense. In analyzing the defense, the Court must consider: (1) whether the official violated a statutory or constitutional right, and (2) whether that right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Kopec*, 361 F.3d at 776. Since the Court concludes that there is a genuine issue of material fact as to whether Officer Thimons used excessive force, *i.e.*, whether Officer Thimons violated a constitutional right, the Court turns to whether the right was clearly established then. *See Parrilla Perez v. Vega*, No. 18-0997, 2020 WL 977433, at *8 (E.D. Pa. Feb. 28, 2020) (turning to clearly established right prong

of qualified immunity analysis after denying summary judgment on excessive force claim).

To answer that question, the Court "conduct[s] a two-part inquiry." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). The Court first "frame[s] the right in light of the specific context of the case, not as a broad general proposition[,]" *id.* (cleaned up), drawing all reasonable inferences in Ms. Simonds's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). Second, the Court decides whether the right, at the time of the constitutional violation, was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Peroza-Benitez*, 994 F.3d at 165 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "Specificity" during this second step "is especially important" in a Fourth Amendment excessive-force context. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

Officer Thimons frames the right as an individual's right to be "free from having her hands pushed together, having her back pressed, and [being] pushed approximately one to two feet into a vehicle when being lawfully handcuffed." ECF 88, p. 28. Ms. Simonds criticizes Officer Thimons's framing as "ignor[ing] the specific evidence in this case[,]" ECF 93, p. 11, but she doesn't define the right herself.

Officer Thimons's definition is both too narrow and fails to view the facts of the case in the light most favorable to Ms. Simonds, and so must be rejected. The Court instead frames the right as:

> an individual's right to be free from excessive force during an arrest, including having arms twisted, being pushed against a vehicle, and being placed in a police vehicle, in such a manner so as to cause pain, which was communicated to the officer during the arrest, while complying with an officer's commands, not resisting arrest, not attempting to escape, and posing no threat of harm.

This framing "define[s] the right . . . at the appropriate level of specificity" by "consider[ing] the specific context of the case"—*e.g.*, both Officer Thimons's actions,

and the context—Ms. Simonds's behavior—surrounding them. *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 117 F.4th 503, 516 (3d Cir. 2024) (cleaned up).

The right defined, the Court turns to whether the right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). "A right is clearly established if there is either 'closely analogous' caselaw establishing that a defendant's conduct was unlawful or evidence that the Defendant's conduct was so patently violative of the right that reasonable officials would know it to be a violation without guidance from a court." *Mack v. Yost*, 63 F.4th 211, 231-32 (3d Cir. 2023) (cleaned up). The Third Circuit "take[s] a broad view of what makes a right clearly established, which can be satisfied even without a precise factual correspondence between the case at issue and a previous case." *Id.* at 232. The touchstone is whether existing precedent has "placed the statutory or constitutional question beyond debate." *Williams*, 117 F.4th at 515 (cleaned up).

The Court finds that the right here was "clearly established" by existing precedent. By way of example, in *Kopec v. Tate*, 361 F.3d 772 (3d Cir. 2004), the Third Circuit held that "the right of an arrestee to be free from the use of excessive force in the course of his handcuffing clearly was established when [the officer] acted in this case, and that a reasonable officer would have known that employing excessive force in the course of handcuffing would violate the Fourth Amendment." 361 F.3d at 778. In that case, like this one, the plaintiff was arrested for disorderly conduct or a non-severe trespass, did not appear to pose any risk of harm, and was handcuffed and complained of pain.

While not factually precise with Ms. Simonds's case (*e.g.*, the plaintiff there complained of more severe pain), *Kopec* is sufficiently analogous and would have provided fair notice here to Officer Thimons as to the existence of a clearly established right within the context of this case. *See also El*, 975 F.3d at 340 (denying qualified immunity, explaining there is a "consensus of pervasive authority that an unarmed

- 24 -

individual who is not suspected of a serious crime—including one who is verbally uncooperative or passively resists the police—has the right not to be subjected to physical force such as being grabbed, dragged, or taken down" (cleaned up)); *Hughes v. Herbster*, No. 23-3122, 2024 WL 4707882, at *4 (3d Cir. Nov. 7, 2024) (looking to *Graham* factors, *Kopec*, and *El*, to find clearly established right to be free from excessive force during arrest).

The Court therefore rejects Officer Thimon's qualified-immunity defense. However, as is clear from the parties' submissions, his defense also rises and falls based on disputed facts. So he may continue to present this defense at trial.

## IV.    Count 9: NIED.

Ms. Simonds's claim for negligent infliction of emotional distress against Ms. Boyer, based on Ms. Boyer's actions on August 27, 2019, goes hand-in-hand with the First Amendment retaliation claim; because that claim survives, this one does too.

That is, Ms. Simonds has presented sufficient evidence to create a dispute of fact as to whether Ms. Boyer lied to the police, as part of the 911 call and when police arrived, by claiming that Ms. Simonds was disorderly, when, in fact, she was not. This caused Ms. Simonds emotional and physical distress when the police descended upon her as part of the incident. ECF 83-3, p. 104:14-22; ECF 84-5, 2:00-5:00.

This claim may thus proceed. *See Vinosky v. Consiglio*, No. 20-134, 2021 WL 4461266, at *14 (W.D. Pa. Sept. 29, 2021) (Haines, J.) ("Specifically, the allegation that [defendants] knowingly provided a false identification of Plaintiff's voice to law enforcement satisfies the elements of the [NIED] cause of action.").

## V.    Count 11: Fourth Amendment Wrongful Initiation of Proceedings.

Count 11 concerns the wrongful initiation of charges by Defendants against Ms. Simonds in violation of the Fourth Amendment. This claim, equivalent to a

Fourth Amendment malicious-prosecution claim,[16] is foreclosed by Third Circuit precedent.

To bring such a claim, Ms. Simonds was required to show deprivation of liberty consistent with a seizure. *Gallo v. City of Phila.*, 161 F.3d 217, 222 (3rd Cir. 1998). Because a claim for malicious prosecution or wrongful initiation focuses on the deprivation of liberty due to proceedings, the deprivation "must occur chronologically after the pressing of charges." *Basile v. Twp. of Smith*, 752 F. Supp. 2d 643, 659 (W.D. Pa. 2010) (Lenihan, M.J.).

There was no deprivation of liberty here, because the charges against Ms. Simonds resulted in a summons/citation in the mail only, with no arrest or bond conditions between issuance and trial. *See DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005) (finding no deprivation of liberty where "[the plaintiffs] were only issued a summons; they were never arrested; they never posted bail; they were free to travel; and they did not have to report to Pretrial Services").

Summary judgment will thus be entered on this claim.[17]

---

[16] *See Thompson v. Clark*, 596 U.S. 36, 43 (2022) ("[T]he gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause. And the wrongful initiation of charges without probable cause is likewise the gravamen of the tort of malicious prosecution.").

[17] Ms. Simonds argues that for a First Amendment retaliation claim, no deprivation of liberty is necessary. That's true; but Count 11 pleads only a violation of the Fourth Amendment. Ms. Simonds acknowledged as much in her motion-to-dismiss briefing. ECF 37, p. 7 (including "deprivation of liberty" element in Fourth Amendment claim discussion); *see also Jacobs v. City of Phila.*, 836 F. App'x 120, 123 & n.6 (3d Cir. 2020) (affirming dismissal of Fourth Amendment malicious-prosecution claim on basis of "deprivation of liberty" element, despite claim stemming from protected speech, where coextensive with First Amendment retaliation claim). This is not to say that at trial Ms. Simonds can't point to Ms. Boyer's allegedly false allegations to police that gave rise to the summons to support her separate First Amendment retaliation claim.

**VI.      Count 12: Pennsylvania Malicious Prosecution.**

In Count 12, Ms. Simonds brings a common-law malicious-prosecution claim against Judge Hanley and Ms. Boyer.

"A malicious prosecution claim under Pennsylvania law requires a plaintiff to show all but the fifth element (deprivation of liberty)" of a Section 1983 Fourth Amendment malicious-prosecution claim.  *Thomas*, 290 F. Supp. 3d at 379 (citing *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000)).  That means Ms. Simonds must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in her favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing her to justice.  *Merkle*, 211 F.3d at 791.

As with her First Amendment retaliation claim, Ms. Simonds has presented sufficient evidence against Ms. Boyer, but not against Judge Hanley.

**A.      Ms. Simonds's malicious-prosecution claim against Ms. Boyer survives.**

The first, second, and fourth elements are met without much trouble.  First, like its federal counterpart, Pennsylvania law extends liability for a malicious-prosecution claim beyond prosecutors when the defendant initiates proceedings.  "A private defendant initiates criminal proceedings where either (1) the private person's desire to have the proceeding initiated was the determining factor in the commencement of the prosecution, for example, through urging officers to prosecute the case; or (2) the public official acted upon the person's false information in carrying out the arrest.  In either circumstance, the actions of the private person preclude the officer from exercising his own discretion in deciding to carry out the prosecution." *Taalibuddeen v. Newberry Twp.*, No. 22-01354, 2024 WL 264675, at *12 (M.D. Pa. Jan. 24, 2024) (cleaned up); *see also Bradley v. Gen. Accident Ins.*, 778 A.2d 707, 711 (Pa. Super. Ct. 2001) (quoting Restatement (Second) of Torts, § 653 cmt. g).

Viewed in the light most favorable to Ms. Simonds, Ms. Boyer's 911 call and reports to the responding officers falsely described her as disorderly, meaning Officer Thimons was "preclude[d] . . . from exercising his own discretion" in charging Ms. Simonds with disorderly conduct. *Taalibuddeen*, 2024 WL 264675, at *12 (cleaned up); *see also Braswell v. Wollard*, 243 A.3d 973, 979 (Pa. Super. Ct. 2020) ("If, for summary judgment purposes, it is presumed that [the defendant] knowingly gave false information to the police, then as a matter of law, it must also be presumed that [the plaintiff's] arrest was initiated by those accusations."); ECF 82-9; ECF 83-4; ECF 94-5.

As for elements two and four, Ms. Boyer prevailed in the summary appeal. And given the animosity between Ms. Boyer and Ms. Simonds over the parking-lot dispute, and the false nature of Ms. Boyer's reports, a jury should decide Ms. Boyer's motivations. *See Tice v. PSP Trooper Tyler Prisk*, No. 23-00823, 2023 WL 7004427, at *4 (M.D. Pa. Oct. 24, 2023) ("Alleging that a defendant procured proceedings against a person by knowingly providing false information to a police officer necessarily demonstrates malice, for a person cannot be arrested on false pretenses for a 'proper purpose.'").

Whether probable cause exists, element three, is a more complicated question. Under Pennsylvania law, "[p]robable cause is 'a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense.'" *Id.* (quoting *Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Local Union 239*, 544 A.2d 940, 942 (Pa. 1988)). Yet, by definition, "when a private individual instigates a criminal proceeding against another with fabricated claims, there is not a reasonable basis for suspicion[.]" *Id.* (cleaned up).

Viewing the facts in the light most favorable to Ms. Simonds, Ms. Boyer lied about Ms. Simonds's disposition in the MDJ office, meaning probable cause for the disorderly citations is absent.

Ms. Boyer's argument—that she and others believed Ms. Simonds was trespassing—doesn't convince the Court otherwise.  ECF 86, pp. 14-15.[18]  As the Court discussed above with respect to the First Amendment claim, the probable-cause analysis is objective, not subjective.  And while the Pennsylvania Commonwealth Court recently held that probable cause for any charge bars a malicious-prosecution claim, *see York v. Kanan*, 298 A.3d 533, 541 (Pa. Commw. Ct. 2023), that case is distinguishable.[19]

The Court thus finds that even if there were probable cause for trespass, that would not bar Ms. Simonds's malicious-prosecution claim based on disorderly conduct.  So Ms. Simonds's malicious-prosecution claim against Ms. Boyer survives.

---

[18] Even on this question, there are genuine disputes of material fact of probable cause for a trespass.  That is, a jury could easily conclude that Ms. Boyer's view of a trespass was pretextual, and patently absurd.  Ms. Boyer appears to have based her position on a court order, ECF 83-5, that concerned a venue matter—*i.e.*, an order that stated that any cases involving Ms. Simonds would be handled in a different venue than the MDJ office at issue.  ECF 82-1, pp. 89:2-20, 93:6-94:10, 97:17-100:11.  Ms. Boyer asserts that this meant that Ms. Simonds was barred from entering the MDJ building.  *Id.*

[19] For one, it relies on an older Third Circuit case whose holding the Third Circuit recently limited.  *See York*, 298 A.3d at 541 (citing *Wright v. City of Phila.*, 409 F.3d 595 (3d Cir. 2005)); *Rivera-Guadalupe*, 124 F.4th at 303 ("[T]he any-crime rule of *Wright* governs claims for false arrest, whereas *Johnson*—and now *Chiaverini*— states the rule for malicious-prosecution claims.").  And it is factually inapposite: unlike the plaintiff in *York*, Ms. Simonds (1) alleges that Ms. Boyer was involved with the initiation of the prosecution; and (2) was not actually charged with the other crime.

**B.    Ms. Simonds's malicious-prosecution claim against Judge Hanley will be dismissed.**

Ms. Simonds's claim against Judge Hanley fails right out of the gate.  For the reasons discussed above with respect to her First Amendment claim against Judge Hanley, no reasonable jury could conclude that Judge Hanley was the "determining factor"—that he "direct[ed], request[ed,] or pressure[d]" the officers—in pursuing the citation.  *Bradley*, 778 A.2d at 711 (quoting Restatement (Second) of Torts, § 653 cmt. g).[20]

The Court will thus dismiss Ms. Simonds's malicious-prosecution claim against Judge Hanley.

**VII.    Ms. Boyer's Immunity Defenses.**

As discussed above, the Court finds that there are triable issues of fact for Counts 2, 9, and 12 to proceed against Ms. Boyer.  In response, Ms. Boyer has invoked a number of immunity defenses, which are based on the fact that she was following a court order that forbid Ms. Simonds from entering the MDJ office.  ECF 86, pp. 15-19.  These defenses miss the mark because the claims here that survive turn on the lies that Ms. Boyer allegedly told to 911 and the police—specifically, that Ms. Simonds was being disruptive—which led to her then being charged with disorderly conduct.  There is no immunity doctrine that shields a government official from intentionally lying to law enforcement due to personal animus.  *See, e.g.*, *Lockhoff v.*

---

[20] Ms. Simonds argues that Judge Hanley's urging the ADA to continue with the prosecution suffices for a malicious-prosecution or abuse-of-process claim.  ECF 91, p. 16.  Ms. Simonds doesn't bring an abuse-of-process claim.  And unlike the First Amendment claim, actions post-dating the initiation of the proceedings are not relevant to the common-law malicious-prosecution analysis: the Court has not found any Pennsylvania court citing Section 655 of the Restatement (Second) of Torts, pertaining to continuing criminal proceedings, and Pennsylvania courts hold that abuse of process, not malicious prosecution, concerns actions beyond initiation.  *See* *McGee v. Feege*, 535 A.2d 1020, 1023 (Pa. 1987) ("Malicious use of civil process has to do with the wrongful initiation of such process, while abuse of civil process is concerned with a perversion of a process after it is issued." (citation omitted)).

*Slonaker*, No. 16-2893, 2017 WL 2423790, at *16 (E.D. Pa. June 5, 2017) ("Because knowingly submitting false allegations to a prosecutor would not serve the interests of the Pennsylvania State Police or be otherwise justified by a legitimate penological purpose, such activity falls outside a Trooper's scope of employment, and so sovereign immunity is unavailable.").[21]

In sum, Ms. Simonds has presented sufficient evidence for a jury to decide Counts 2, 9, and 12 against Ms. Boyer. The theories against Ms. Boyer that survive and that will be the focus of trial center on Ms. Boyer's retaliation against Ms. Simonds's enforcement of the consent order, and the alleged lies that Ms. Boyer told to 911 and law enforcement on August 27, 2019, which caused Ms. Simonds to be charged for disorderly conduct.

## CONCLUSION

For these reasons, the Court will grant in part and deny in part Defendants' summary-judgment motions. Ms. Simonds may proceed to trial on Counts 2, 9, and 12 against Ms. Boyer, and on Count 5 against Officer Thimons. Judgment will otherwise be entered in Defendants' favor on all other remaining counts. A separate order follows.

Dated: February 12, 2025                    BY THE COURT:

                                            */s/ J. Nicholas Ranjan*
                                            United States District Judge

---

[21] Even if immunity doctrines could apply, there are disputes of material fact on many issues associated with application of those doctrines. For example, Ms. Boyer claims that she was acting within the scope of her employment when she called police, as she was enforcing a court order. A jury could find that it was not within the scope of the secretary's employment to interpret and enforce court orders. A jury could also find from even a reading of the plain language of the order, that it clearly didn't apply, and was simply a pretext for her personal animus.